GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     JEFFREY K. POWELL
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2706
Email: Jeffrey.Powell@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AMEET K. GOYAL, M.D. and AMEET GOYAL, M.D., P.C. d/b/a THE EYE ASSOCIATES GROUP, <br><br> Defendants. | COMPLAINT <br><br> 19 Civ. 10832 <br><br> JURY TRIAL DEMANDED |

Plaintiff the United States of America (the "United States" or the "Government"), by its attorney Geoffrey S. Berman, United States Attorney for the Southern District of New York, alleges for its complaint as follows:

## PRELIMINARY STATEMENT

1.      This is a civil fraud action brought by the United States (the "Government") against Ameet K. Goyal, M.D. ("Goyal") and the entity that owns his ophthalmology and oculoplastic medicine practice, Ameet Goyal, M.D., P.C. d/b/a The Eye Associates Group (collectively "Defendants"), under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), to recover treble damages sustained by, and civil penalties owed to, the Government as a result of the submission of false and fraudulent claims for reimbursement to Medicare, Medicaid, and

the Medicaid Managed Care Organizations that contract with the State of New York

("Government Healthcare Payors").  The Government also seeks to recover damages under the

common law for payment by mistake of fact and unjust enrichment.

2.      As set forth in more detail herein, from January 2010 through February 2017,

Defendants knowingly submitted, or caused to be submitted, claims for reimbursement to

Government Healthcare Payors for medical services allegedly rendered by Goyal that (i) were

not actually performed; (ii) were not documented in the medical records; (iii) were not medically

necessary; and/or (iv) failed to otherwise comply with Medicare and Medicaid rules and

regulations.  Defendants submitted, or caused to be submitted, thousands of false and fraudulent

claims to Government Healthcare Payors, and Defendants received payments based on those

claims.

3.      Specifically, Defendants engaged in widespread healthcare fraud by consistently

upcoding surgical procedures, examinations, and tests to maximize the reimbursement they

would receive from Government Healthcare Payors.  In order to justify this billing, Defendants

falsified patient diagnoses and prepared operative reports that falsely described the procedures

performed on patients.  Information contained in patient medical files, including clinical notes,

patient photographs, pathology reports, and the recorded duration of procedures, clearly

contradict the diagnoses and procedure codes billed.  Defendants also routinely billed, or caused

to be billed, multiple different procedure codes for a single surgery, frequently fraudulently

appending modifiers to the codes to allow them to bill for procedures that would otherwise not

be eligible for reimbursement.  Goyal directed his staff to engage in these fraudulent billing

practices, pressured other ophthalmologists in his practice to engage in fraudulent upcoding, and

threatened to fire them if they did not do so.

2

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims brought under the FCA pursuant to

31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the common law claims pursuant

to 28 U.S.C. § 1345.

5.      The Court may exercise personal jurisdiction over Defendants, and venue lies in

this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because

Defendants reside and transact business in this District and a substantial part of the acts

complained of took place in this District.

6.      No official of the United States charged with responsibility to act in the

circumstances knew or should have known of the facts material to the FCA claims related to the

fraudulent billing practices alleged herein prior to February 2017.  In October 2019, the

Government and Goyal entered into a tolling agreement, pursuant to which the parties agreed

that any statute of limitations applicable to the claims at issue here would be tolled from March

7, 2019, through November 15, 2019.

## PARTIES

7.      Plaintiff is the United States of America and is suing on its own behalf and on

behalf of the United States Department of Health and Human Services ("HHS"), and its

component agency, the Centers for Medicare and Medicaid Services ("CMS").

8.      Defendant Ameet K. Goyal, M.D. is an ophthalmologist and oculoplastic surgeon

who, during the relevant period, owned and operated an ophthalmology and oculoplastic

medicine practice (the "Practice") with the following locations:  (1) Rye Eye Associates, 167

Purchase Street, Rye, NY 10580; (2) Dutchess Eye Associates, 741 Sergeant Palmateer Way,

Wappingers Falls, NY 12590; (3) Greenwich Eye Associates, 4 Dearfield Drive, Greenwich, CT

06830; and (4) Mt. Kisco Eye Associates, 69 South Moger Avenue, Mt. Kisco, NY 12590.  The

Practice employed general ophthalmologists, who typically performed exams and limited

specialized procedures, as well as oculoplastic surgeons, who performed eye surgeries.  Goyal

oversaw all aspects of the Practice's operations, and performed procedures on Medicare and

Medicaid patients at his offices as well as at off-site locations.  Goyal resides in Rye, New York.

9.    Defendant Ameet Goyal, M.D., P.C. d/b/a The Eye Associates Group is the entity

that owns the Practice.  Its principal place of business is located at 167 Purchase Street, Rye, NY

10580.

## BACKGROUND

### I.    The Medicare Program

10.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is

based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.

HHS is responsible for the administration and supervision of the Medicare program.  CMS is an

agency of HHS and is directly responsible for the administration of the Medicare program.

11.    Medicare has several parts, including Part B, which primarily covers payments for

physicians' services, supplies incident to physicians' services, and diagnostic tests.

12.    To assist in the administration of Part B, CMS contracts with Medicare

Administrative Contractors ("MACs") to administer and pay Part B claims from the Medicare

Trust Fund.  *See* 42 U.S.C. § 1395u.  Physicians submit claims for payment to MACs, and, in

turn, MACs process medical claims for Medicare beneficiaries.

13.    Medicare enters into agreements with physicians to establish the physician's

eligibility to participate in the Medicare program.  Specifically, on the Medicare enrollment

form, CMS Form 855I, the "Certification Statement" that the medical provider signs states:

"You MUST sign and date the certification statement below in order to be enrolled in the

Medicare program.  In doing so, you are attesting to meeting and maintaining the Medicare

requirements stated below."  Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . .  The Medicare laws, regulations and program instructions are available through the fee-for-service contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . and on the supplier's compliance with all applicable conditions of participation in Medicare.

> *****

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

**II.     The Medicaid Program**

14.     Pursuant to the provisions of Title XIX of the Social Security Act, 42 U.S.C.

§ 1396 *et seq.,* the Medicaid program was established in 1965 as a joint federal and state

program created to provide financial assistance to individuals with low income to enable them to

receive medical care.  Under Medicaid, each state establishes its own eligibility standards,

benefit packages, payment rates, and program administration rules in accordance with certain

federal statutory and regulatory requirements.  The state directly pays the health care providers

for services rendered to Medicaid recipients, including physician-based services, with the state

obtaining the federal share of the Medicaid payment from accounts which draw on the United

States Treasury.  *See* 42 C.F.R. §§ 430.0 *et al.*  The federal portion of each state's Medicaid

payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the

state's per capita income compared to the national average.  *See* 42 U.S.C. § 1396d(b).

15.     The majority of states, including New York, award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs.  Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter.  CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter.  The State then draws down federal funding as actual provider claims, including claims from physicians seeking payment for services, are presented for payment.  After the end of each quarter, the State then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures).  *See* 42 C.F.R. § 430.30.

16.     Providers who participate in the Medicaid program, including physicians, must sign enrollment agreements with the State that certify compliance with state and federal Medicaid requirements.  The agreements require, in substance, that the Medicaid providers agree to comply with all state and federal laws and Medicaid rules and regulations in connection with providing services and care to patients and billing the state Medicaid program for services or supplies furnished.  Providers may only submit Medicaid claims for services provided in compliance with Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State.  18 NYCRR § 504.6(d).

17.     Medicaid providers, including physicians, must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations.

18.     In New York State, Medicaid service providers, including physicians, are either reimbursed directly by the State on a fee-for-service basis, or through claims submitted to Managed Care Organizations ("MCOs").  The State contracts with MCOs to provide benefits to Medicaid beneficiaries and the MCOs receives monthly capitation payments for providing these services.  Providers, including physicians, submit claims for payment to the MCO for services provided to Medicaid beneficiaries enrolled in the managed care plan.  Claims for payment submitted to MCOs are deemed to be "claims" under the FCA since the managed care plan is a "contractor, grantee, or other recipient," the money is being used "to advance a Government program or interest," and the Government provides or has provided a portion of the money requested and/or will reimburse the MCO for a portion of the money requested.  31 U.S.C. § 3729(b)(2)(A).

19.     In New York, Medicaid providers, including physicians and MCOs, must periodically submit a "Certification Statement for Provider Billing Medicaid," in which the provider certifies that claims submitted "to the State's Medicaid fiscal agent, for services or supplies furnished," "will be subject to the following certification. . . . I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations."

20.     In their agreements with providers, MCOs require providers to comply with the rules and regulations of the Medicaid program.

### III.     CPT Codes and Billing Process

21.     In order to receive reimbursement payments from the Government for medical services covered by Medicare and Medicaid, a provider must submit claims for payment.  These claims must contain Current Procedural Terminology ("CPT") codes, which are a set of standardized medical codes developed and maintained by the American Medical Association that are used to identify and report the medical, surgical, and diagnostic procedures and services provided.  The claims are required to reflect, among other things:  (a) the diagnosis code that accurately identifies the medical diagnosis or the patient's condition; (b) the date the service was rendered; (c) the name of the patient who received the services; and (d) the name of the provider. Claims for reimbursement for Medicare Part B services and Medicaid services are submitted on CMS Form 1500 or via the 837P electronic process.

22.     Government Healthcare Payors use CPT codes to determine both coverage, *i.e.*, if they will pay for the billed medical procedures and services, and reimbursement, *i.e.*, how much they will pay for the billed medical procedures and services.

23.     Each procedure, service, or item furnished to a patient has a specific CPT code. Further, each CPT code receives a certain level of reimbursement, which can vary depending on what other codes are billed.  The amount of money a physician or other medical provider is paid by Medicare or Medicaid for a service rendered to a patient depends on which CPT codes are submitted as part of the corresponding claim.  In addition to the CPT code, providers are required to affix a diagnosis code to each claim.

24.     For all codes, the service or procedure must be documented sufficiently by the physician or qualified non-physician practitioner in the patient's medical record to support any claim submitted to Medicare or Medicaid for the service or procedure.

25.      In the Medicare Program Integrity Manual, CMS lists as an example of Medicare fraud the incorrect reporting of procedures to maximize payments and billing for services not furnished.  *See* Medicare Program Integrity Manual, Section 4.2.1, Rev. 827, 09-21-18.

26.      Providers can bill only for services such as examinations, tests, and procedures that are actually performed and medically necessary.  Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(l)(A); *see also*  42 C.F.R. § 424.5(a)(6); *see also* N.Y. Soc. Serv. Law § 365-a(2) (defining Medicaid "standard coverage" to include "the cost of medically necessary medical … care, services, and supplies ….")

27.      When submitting a claim under Part B, physicians must certify that the services listed "were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision . . . ."  CMS Form 1500.  Similarly, when billing Medicaid, physicians must certify that "the care, services . . . itemized have in fact been furnished .  . . ." 18 NYCRR § 540.7(a)(8).

28.      In addition, in order for a claim to be eligible for reimbursement, the health care provider must appropriately document the medical necessity and quality of the services provided. *See* 42 U.S.C. § 1320c-5(a)(3); 18 NYCRR § 540.7(a)(10).

## FACTUAL ALLEGATIONS

### I.   Defendants' Fraudulent Billing Practices

29.     From January 2010 through February 2017, Defendants routinely knowingly submitted, or caused to be submitted, claims to Government Healthcare Payors for surgical procedures, examinations, and tests purportedly performed by Goyal that were not actually performed, not medically necessary, not documented in the medical records, and/or failed to otherwise comply with Medicare and Medicaid rules and regulations.  Defendants falsely "upcoded" routine procedures and submitted false patient diagnosis codes.  If Defendants had used the correct CPT codes, Defendants would have received much lower rates of reimbursement.  As a result of the misrepresentations in the submission of claims to Government Healthcare Payors, Defendants received payments to which they were not entitled.

30.     A "superbill" is an itemized form used by medical practitioners to record the procedures and diagnoses for a patient visit.  The superbill is generally customized for a provider's office and contains, among other information, the most common CPT codes used by that office.

31.     The surgical coordinators at the Practice were directed to mark certain CPT codes and diagnosis codes on the superbill in advance of each procedure.  Goyal directed, and caused others to direct, the surgical coordinators to pre-mark CPT codes associated with higher rates of reimbursement than the CPT codes applicable to the procedures Goyal actually performed.

32.     After procedures were performed, the ophthalmologists at the Practice, including Goyal, reviewed and approved the superbills, making any necessary changes.  The superbills were then provided to medical billing staff, who would submit claims for reimbursement using the false higher-paying procedure and diagnosis codes reflected on the superbill.  Goyal

determined the CPT codes and diagnosis codes to be used when submitting claims for reimbursement for procedures and medical care provided by him.

33.     The Practice maintained a manual that included the CPT codes, and accompanying diagnosis codes, that were supposed to be used for the most common surgeries. This manual was internally referred to as the "billing bible."  The "billing bible" listed multiple CPT codes and diagnosis codes to use for each surgery, including billing codes associated with procedures that rarely if ever would be medically necessary to perform in connection with the specific surgery.  Goyal instructed surgical coordinators and medical billing staff to use the CPT codes and diagnosis codes listed in the "billing bible" when pre-marking codes on the superbill and submitting claims for reimbursement.  As a result, Defendants repeatedly billed the same set of inaccurate CPT codes to Government Healthcare Payors for various types of surgeries.

34.     Goyal used pre-typed template operation reports for the different types of surgery he commonly billed.  These boilerplate reports included generic and vague descriptions of the procedures billed to Government Healthcare Payors and other insurers.  The reports were frequently false and misrepresented the procedures Goyal actually performed.

35.     The patient files maintained by the Practice contain records and information that contradict the diagnosis and CPT codes billed to Government Healthcare Payors.  The clinical notes of other physicians who treated the patient, post-operative notes, photographs of the patient's eye before and after a procedure, pathology reports of specimens taken during a procedure, and the recorded duration of the procedure are frequently inconsistent with the diagnosis and CPT codes that were submitted to Government Healthcare Payors.

36.     Defendants repeatedly billed for a wide range of surgical procedures, examinations, and tests that Goyal did not perform.  The following are some examples of

11

Defendants' more common fraudulent upcoding practices, but are not intended to serve as an exhaustive list of these practices or the billing codes Defendants fraudulently, submitted, or caused to be submitted to Government Healthcare Payors.

### A.    Fraudulent Billing of Orbitotomies

37.    Defendants regularly billed Government Healthcare Payors for orbitotomies, which are complex and time-consuming procedures, when Goyal actually only performed the excision of a chalazion or a similar superficial eyelid procedure.

38.    An orbitotomy involves an incision into the orbit of the eye, usually to remove a tumor or mass located in the orbit.  An orbitotomy typically takes at least an hour to perform.

39.    A chalazion is a small, benign bump or nodule on the eyelid that is usually caused by a blocked oil gland.  Chalazions are typically treated with warm compresses and gentle massages and clear up on their own.  Chalazions that require surgical intervention are usually removed through a simple procedure that involves a small incision into the eyelid and drainage. The removal of a chalazion is among the most common and straightforward procedures performed by an ophthalmologist, and typically takes fewer than 15 minutes.

40.    The reimbursement rates for the CPT codes associated with an orbitotomy (*e.g.,* CPT code 67412) are much greater than the reimbursement rates for the CPT codes associated with an excision of a chalazion (*e.g.*, CPT code 67800) or other procedures where the pathology is located in the eyelid as opposed to in the orbit.

41.    Goyal frequently prepared false, boilerplate operation reports for the procedures he billed as orbitotomies.  These reports falsely described the removal of an orbital growth from the patient's eye, which did not in fact exist, and falsely referred to incisions that Goyal did not perform.  Goyal prepared these false operation reports to make it appear that he had performed

an orbitotomy in the event that he was asked for documentation to justify claiming the higher reimbursement rate.

42.     At the direction of Goyal, the Practice utilized the same patient consent form for an excision of a chalazion and an orbitotomy, even though they are very different procedures. The form used was titled:  "Consent Form for Incision and Drainage of Chalazion/Excision of Lesion/Orbitotomy."  This heading misled patients into believing that an orbitotomy was substantially the same as a chalazion excision so that patients would not raise questions when the Practice billed their insurers for an orbitotomy.  However, the body of the form stated that the patient had been diagnosed with a chalazion, described the procedure to be performed as an incision and drainage of a chalazion, and made no references to an orbital mass or an orbitotomy (or the excision of a lesion for that matter).  Through the use of this form, Defendants made it appear that patients had consented to an orbitotomy when in fact an orbitotomy had not been performed.

43.     Even though the excision of a chalazion was among the most common procedures performed by Goyal and other ophthalmologists in the Practice, the "billing bible" did not include any instruction on how to bill this procedure or reference chalazions at all.  This was because Goyal did not want ophthalmologists to bill for chalazion removals given their low reimbursement rate.

44.     From January 2010 through February 2017, Defendants submitted, or caused to be submitted, over 490 claims for Medicare and Medicaid patients using orbitotomy CPT codes for procedures performed by Goyal.  A substantial number of these claims were false.  In contrast, during the same period, Goyal rarely submitted claims to Government Healthcare

Payors with chalazion removal CPT codes, even though he regularly performed these minor procedures.

45.     From January 2012 through February 2017, Goyal billed Medicare for the CPT code 67412 more frequently than any other ophthalmologist in the tri-state area.  He repeatedly billed 5-6 "orbitotomies" on the same day, usually spending fewer than 15 minutes on each procedure.

46.     Moreover, when removing chalazions, Goyal frequently billed Government Healthcare Payors for additional procedures that he also did not perform or were medically unnecessary.

47.     For example, Goyal regularly improperly billed for a conjunctivoplasty along with the orbitotomy, using CPT codes 68320 and 68325.  It is typically not medically necessary to perform a conjuntivoplasty when removing a chalazion.

48.     A conjunctivoplasty is a procedure that removes or rearranges a part of the conjunctiva — the clear, thin membrane that covers a part of the front surface of the eye and the inner surface of the eyelid.  A conjunctivoplasty is sometimes performed to graft or extend tissue onto a conjunctival wound.  CPT code 68325 refers to a conjunctivoplasty with a buccal membrane graft, and involves grafting tissue from the patient's mouth to his or her eye or eyelid.  CPT code 68325 has a higher Medicare reimbursement level than CPT code 68320 because it a more complex procedure.  From January 2012 through February 2017, Goyal submitted, or caused to be submitted, claims to Medicare for CPT code 68325 more frequently than any other ophthalmologist in the tri-state area.

## B.      Fraudulent Billing for Eyelid Reconstruction Procedures

49.      Defendants regularly billed Government Healthcare Payors for eyelid surgeries involving eyelid reconstructions that Goyal did not actually perform and/or are not supported by documentation in the patient's medical record.

50.      CPT code 67961 is used to describe an extensive surgery that entails the excision and repair of an eyelid, involving the lid margin, tarsus, conjunctiva, canthus, or a full thickness defect of the eyelid (*i.e.,* all layers of the eyelid).  This procedure typically requires an extensive reconstruction of the eyelid.

51.      Defendants billed CPT code 67961 to Government Healthcare Payors even though Goyal did not perform the procedure associated with this code.  Defendants fraudulently sought reimbursement for CPT code 67961 for procedures that only involved the excision of a chalazion or the removal of a small lesion on the eyelid, which did not involve the type of reconstruction or lesion that would justify the use of CPT code 67961.  If Defendants had used the appropriate and correct CPT code for such procedures, they would have received a lower payment.

52.      Goyal also prepared false, boilerplate operation reports for procedures that were fraudulently billed using CPT code 67961.  These reports often falsely described a reconstruction of the eyelid involving an incision through "skin, muscle and tarsus" to repair a full-thickness defect of the eyelid.  This description was inconsistent with the other records in the patient's medical record.

53.      From January 2010 through February 2017, Defendants submitted, or caused to be submitted, over 670 claims for Medicare and Medicaid patients using CPT code 67961 for procedures performed by Goyal.  A significant number of these claims were false.

15

54.     From January 2012 through February 2017, Goyal submitted, or caused to be submitted, claims to Medicare for CPT code 67961 more frequently than any other ophthalmologist in the tri-state area.

## C.     Fraudulent Billing of Adjacent Tissue Transfers

55.     Defendants regularly billed Government Healthcare Payors for adjacent tissue transfers that Goyal did not perform and/or are not supported by documentation in the patient's medical record.

56.     An adjacent tissue transfer, often referred to as a "flap repair," involves the relocation of a flap of healthy skin to an adjacent laceration or wound.  Different CPT codes are assigned to adjacent tissue transfers based on where the flap is taken from and the size of the defect area to be repaired.  CPT code 14060 may be used for procedures that involve transferring tissue to repair a wound of the eyelid where the defect is 10 square centimeters or less.   CPT code 14061, which has a higher reimbursement level, may be used when the defect area is between 10.1 and 30 square centimeters.

57.     Goyal improperly billed for CPT codes 14060 and 14061 when seeking reimbursement for procedures that did not involve any open wound of the eye or eyelid requiring a flap repair.  For example, Goyal frequently billed CPT codes 14060 or 14061 for blepharoplasties/ptsosis repairs — procedures to repair droopy eyelids through the removal of excess skin.  These procedures do not require flap repairs.  During these procedures, Goyal would have needed to simply close the wound he had created to perform the blepharoplasty/ptsosis repair.   There would have been no need to transfer or rearrange any tissue to reconstruct the eyelid.  To the extent that Goyal actually performed a flap repair during these procedures, it would have been medically unnecessary.

16

58.     Goyal also often fraudulently billed CPT code 14061 for eyelid procedures when the defect area was smaller than the 10.1 square centimeters required to use this code.  Indeed, eyelid defect areas are rarely that large.

59.     From January 2010 through February 2017, Defendants submitted, or caused to be submitted, over 420 claims for Medicare and Medicaid patients using CPT code 14060 for procedures performed by Goyal.  They also submitted, or caused to be submitted, over 600 claims for Medicare and Medicaid patients using CPT code 14061 for procedures performed by Goyal.  A substantial number of these claims were false.

60.     From January 2012 through February 2017, Goyal ranked second and fourth in terms of the frequency with which ophthalmologists in the tri-state area billed Medicare for CPT codes 14061 and 14060, respectively.

### D.     Fraudulent Billing of Dacro Cysto Rhinostomies ("DCRs")

61.     Defendants regularly billed Government Healthcare Payors for Dacro Cysto Rhinostomies ("DCRs") that Goyal did not perform and/or are not supported by documentation in the patient's medical record.

62.     One of the more common conditions treated by ophthalmologists is a clogged tear duct that prevents tears from draining properly.  A DCR is a complex surgery to treat a clogged tear duct through the creation of an alternate tear drainage pathway between the nose and eye.  A DCR necessarily requires the breaking or removal of bone.

63.     Defendants billed Government Healthcare Payors for DCRs when the medical record shows Goyal actually performed less complex procedures to address a clogged tear duct, such as the probing of the tear duct with a stent.  The reimbursement rates for the CPT codes

associated with a DCR, including CPT codes 68720 and 68750, are significantly greater than the reimbursement rates for other procedures to treat a clogged tear duct.

64.     From January 2010 through February 2017, Defendants submitted, or caused to be submitted, over 310 claims for Medicare and Medicaid patients using CPT codes 68720 and 68750 for procedures performed by Goyal.  A substantial number of these claims were false.

### E.     Fraudulent Billing of Extended Ophthalmoscopies

65.     Defendants regularly billed Government Healthcare Payors for extended ophthalmoscopies with retinal drawings that he did not perform and/or are not supported by documentation in the patient's medical record.

66.     An extended ophthalmoscopy is a detailed examination of the interior of the eyeball with a retinal drawing that is done for diagnostic purposes.  The test goes beyond the standard retinal examination typically performed during a routine eye examination.  An extended ophthalmoscopy is only indicated for serious retinal pathology.  Medicare requires ophthalmologists to maintain the detailed retinal drawing in the patient's record to show that the procedure was performed.

67.     When billing for routine office visits and examinations, Goyal regularly billed Government Healthcare Payors for extended ophthalmoscopies that he did not actually perform. Goyal billed Government Healthcare Payors for performing extended ophthalmoscopies on patients who did not have serious retinal pathology.

68.     From January 2010 through February 2017, Defendants submitted, or caused to be submitted, over 2,410 claims for Medicare and Medicaid patients using CPT codes 92225 and 92226 (the codes associated with initial and subsequent extended ophthalmoscopies) for examinations performed by Goyal.  A substantial number of these claims were false.

18

### F.        Fraudulent Use of Modifier Codes

69.        The Practice fraudulently appended modifiers to CPT codes to allow Defendants to bill for procedures that would otherwise not be eligible for reimbursement.  The Defendants knowingly used the modifiers to falsely bill and receive payments from Government Healthcare Payors for procedures that should have been bundled together into a single claim and payment.

70.        Procedure code modifiers are two-digit codes that are added to the basic five-digit CPT code under limited circumstances to provide additional information related to the procedure or test performed.  Physicians are required to maintain documentation in the patient's file showing that application of the modifier is supported.

71.        Goyal routinely appended, or directed his staff to append, the -59 modifier to CPT codes to allow him to improperly bill for multiple procedures performed on the same day that typically would be bundled because they are commonly performed together as part of the same patient encounter.  The manager of the Practice's billing group was directed to generally include the -59 modifier whenever billing multiple CPT codes.

72.        Pursuant to CMS billing guidelines, certain CPT codes are bundled meaning that they ordinarily cannot be billed separately because one code (and payment) encompasses the related procedure as well.  The -59 modifier signifies a distinct procedural service and may be used only under limited circumstances to indicate that a procedure was actually distinct or independent from the other procedure performed on that patient that day.  For example, the -59 modifier may represent that two procedures typically performed together were performed during a different patient encounter, on different anatomic sites, or through separate incisions or excisions.

73.     Goyal knowingly misused the -59 modifier by appending, or directing his staff to append, the modifier to CPT codes without any legitimate basis.  For example, Goyal frequently applied the -59 modifier to unbundle CPT code 15823 (blepharoplasty) and CPT code 67904 (ptosis repair), two procedures that are bundled together and are typically not allowed to be separately billed.

74.     By improperly using modifier codes to unbundle procedure codes, Defendants were able to obtain reimbursement for services that would not have otherwise been paid by Government Healthcare Payors.

75.     Goyal also fraudulently used, or directed staff to fraudulently use, the -79 modifier.  The Medicare reimbursement amount for a surgery includes any necessary post-operative services routinely provided to the patient after surgery within the specified post-operative period (referred to as the "global period").  The -79 modifier is supposed to be used to indicate that a subsequent surgery performed by the same physician within the global period was actually unrelated to the original surgery and thus eligible for reimbursement.

76.     Goyal knowingly misused, or directed his staff or misuse, the -79 modifier to seek reimbursement for procedures performed within the global period that would otherwise not be eligible for reimbursement.

77.     Defendants submitted, or caused to be submitted, an unusually high number of claims with appended modifiers.  From January 2010 through February 2017, the Practice appended the -59 or -79 modifiers to over 7,000 CPT codes in claims submitted to Medicare for services provided by Goyal.  A substantial number of the claims involved the knowing misuse of the modifiers and were false.

## II.     Pressure on Other Surgeons to Engage in Fraudulent Billing

78.     Throughout the relevant period, Goyal exerted pressure on other ophthalmologists within the Practice to engage in the fraudulent billing practices described above.

79.     Goyal directed multiple ophthalmologists in the Practice to bill for procedures that they did not perform, including billing chalazion excisions and other minor eyelid procedures as orbitotomies.

80.     Goyal threatened to fire, and malign the reputation of, employees who did not comply with his billing directions.

## III.     Patient Examples

81.      Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Government Healthcare Payors for services purportedly provided by Goyal to hundreds of Medicare and Medicaid beneficiaries.  The following are examples of false claims submitted for services purportedly provided by Goyal to certain Medicare beneficiaries.  These examples are intended to be illustrative only and are not an exhaustive list of all false claims submitted.

### Patient AT[1]

82.     Patient AT was treated by Goyal on several occasions from December 2010 through November 2016.  Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Medicare seeking payment for services allegedly provided by Goyal to Patient AT that (i) were not actually performed; (ii) were not documented in the medical records; (iii) were not medically necessary; and/or (iv) failed to otherwise comply with Medicare rules

---

[1] In order to protect the confidentiality of patients' personal health information, this Complaint uses pseudonyms for the names of specific patients whom Goyal treated.  The Government will disclose the names of these patients to Defendants upon request.

and regulations.  Goyal's own medical records indicate that the claims submitted to Medicare were false.

83.     Defendants billed Medicare for a surgery performed on Patient AT on January 17, 2011, using seven different CPT codes.  The medical record does not support most of the CPT codes billed for this surgery.  For example, Goyal's own operative report does not even reference some of the procedures allegedly performed, including CPT code 15260 (full thickness graft), CPT code 12051 (donor site repair), and CPT code 66250 (repair of an open wound of the eye).  In addition, a photograph of the patient taken on February 23, 2011, shows no evidence that the billed skin graft had been recently performed.  Further, Defendants improperly appended the modifier -59 to four of the billed CPT codes in order to unbundle the procedure codes and obtain payment for all of them.  Defendants also improperly billed Medicare for a surgery performed a week later on Patient AT using the same seven CPT codes.

84.     Defendants billed Medicare for a procedure performed on Patient AT on February 1, 2011, using CPT code 67412 (orbitotomy) and CPT code 15576 (creation of a flap for eyelid reconstruction).  As explained above, an orbitotomy is a complex procedure that involves an incision into the orbit.  CPT code 15576 refers to a complex procedure to repair large wounds or defects.  There is no evidence in the medical file to suggest that Goyal actually performed either of these procedures on February 1, 2011.  To the extent Goyal performed these procedures, they would have been medically unnecessary.  The medical record indicates that Patient AT developed a wound dehiscence at the outer corner of both eyes following the January 2011 surgery referenced above.  Neither of the procedures that Goyal claimed he performed on February 1, 2011, would be used to close this type of small skin wound dehiscence.  There is also no operation report in the patient's file describing an orbitotomy or the creation of a flap.  In

addition, the photograph taken on February 23, 2011, does not reflect a flap being created.

Further, the anesthesia record reflects a total surgical time of 20 minutes, which is significantly

less time than it would take to complete an orbitotomy and create a flap.

85.     Defendants billed Medicare for a procedure performed on Patient AT on

November 1, 2016, using CPT code 67412 (orbitotomy) and CPT code 68320

(conjunctivoplasty).  Again, the medical record does not support this claim and instead indicates

that Goyal actually performed a superficial eyelid procedure.  For example, notes of prior office

visits do not reference any complaints or physical findings relating to the existence of a

conjunctival or orbital mass.  In addition, the pathology specimen submitted after the procedure

identified tissue from the right eyelid, not the orbit.  Further, the anesthesia record reflects a total

surgical time of 37 minutes, which is significantly less time than it would take to complete an

orbitotomy and a conjunctivoplasty.  Goyal  prepared a false, boilerplate operation report to

make it appear that he had performed an orbitotomy.

### Patient WD

86.     Patient WD was treated by Goyal on several occasions from January 2014

through May 2015.  Defendants knowingly submitted, or caused to be submitted, fraudulent

claims to Medicare seeking payment for services allegedly provided by Goyal to Patient WD that

(i) were not actually performed; (ii) were not documented in the medical records; (iii) were not

medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations.

Goyal's own medical records indicate that the claims submitted to Medicare were false.

87.     Defendants billed Medicare for a procedure performed on Patient WD on May 8,

2015, using CPT code 67412 (orbitotomy) and CPT code 14060 (flap repair where defect is 10

square centimeters or less).  The medical record does not support the CPT codes billed for this

surgery and instead indicates that Goyal actually performed a straightforward procedure to remove tissue from Patient WD's left upper eyelid, which has a lower Medicare reimbursement level.  For example, notes from a follow-up office visit state that Patient WD was seen for a "ptsosis repair" — a fairly simple procedure to repair a droopy eyelid — not an orbitotomy.   In addition, the results of the testing that Patient WD underwent prior to the procedure revealed findings limited to the eyelid.  None of the testing reflects any evidence of orbital disease that would require an orbitotomy.  Although the operative report refers to the removal of a large "blood filled cyst" in the orbital space, the pathology report from the surgery does not describe a cyst, hemorrhagic tissue, or any orbital pathology.

88.     Further, the use of CPT code 14060 was also not justified.  Goyal performed a standard eyelid crease incision and was thus not permitted to bill CPT code 14060 for closure of the wound.  The eyelid incision did not require a flap repair.  Indeed, Goyal routinely improperly billed for flap repairs, using CPT codes 14060 and 14061, when closing eyelid crease incisions.

**Patient CC**

89.     Patient CC was treated by Goyal on several occasions from August 2013 through April 2015.  Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Medicare seeking payment for services allegedly provided by Goyal to Patient CC that (i) were not actually performed; (ii) were not documented in the medical records; (iii) were not medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations.  Goyal's own medical records indicate that the claims submitted to Medicare were false.

90.     Defendants billed Medicare for procedures performed on Patient CC's right eye on October 7, 2013, and Patient CC's left eye on October 21, 2013, using CPT code 67412 (orbitotomy) and CPT code 14061 (flap repair where defect area is between 10.1 and 30 square

centimeters) for both procedures.  The medical record does not support the CPT codes billed and

instead indicates that, on each of these dates, Goyal actually performed a straightforward

procedure to remove excess tissue from Patient CC's upper eyelids (a blepharoplasty), which has

a lower Medicare reimbursement level.  For example, in an August 30, 2013 letter to the

referring physician, Goyal reported that Patient CC "had problems with swelling in both eyes"

that were "probably due to blepharochalasis," and that he had discussed "surgery to remove the

excess tissue in the upper lids."  In addition, the photographs of Patient CC taken before and

after the surgeries are consistent with the appearance of a patient who had undergone a bilateral

upper blepharoplasty, not the orbitotomies and flap repairs billed to Medicare.

91.     When billing the procedures performed on October 7, 2013 and October 21, 2013,

Defendants also fraudulently appended the -59 modifier to CPT code 14061 to unbundle the

orbitotomy and flap repair and seek Medicare payments for both procedures.  Moreover, to

obtain Medicare reimbursement for the October 21 procedure, Defendants improperly appended

the -79 modifier to the billed CPT codes.

92.     Defendants billed Medicare for a surgery performed on Patient CC on November

25, 2013, using CPT code 67917 (ectropion repair), CPT code 67875 (tarsorrhaphy), and CPT

code 67715 (canthotomy).  The medical record does not support the CPT codes billed and

instead indicates that Goyal actually performed a cosmetic bilateral lower blepharoplasty on that

date, which is not eligible for Medicare reimbursement.  For example, none of the pre-operative

evaluations identify symptoms or findings related to ectropion or conjunctival endema (*e.g.*,

swelling of eye tissue).   In addition, the photographs of Patient CC taken before and after the

surgery are consistent with the appearance of a patient who underwent a cosmetic bilateral lower

blepharoplasty, not an ectropion repair.  When billing for the procedure performed on November

25, 2013, Defendants also fraudulently appended the -59 modifier to CPT code 67715 so that they would be reimbursed separately for the canthotomy, which is typically considered part of an ectropion repair.

93.     The actual procedure performed on November 25, 2013, was a bilateral lower blephoplasty.  The medical records do not indicate that the blephoplasty was medically necessary or anything but a cosmetic procedure.  Medicare does not cover cosmetic procedures.  In addition to improperly billing Medicare, Defendants collected a $3,000 out-of-pocket payment from Patient CC for the November 25 surgery.

94.     Defendants billed Medicare for a surgery performed on Patient CC on February 24, 2014, using CPT code 67412 (orbitotomy) and CPT code 68325 (conjunctivoplasty with buccal mucous membrane graft).  The medical record does not support the CPT codes billed and instead indicates that Goyal performed a less complex procedure to remove granulomas[2] that Patient CC had developed following the November 25, 2013 surgery.  Such granulomas are not located in the orbit and are not removed through an orbitotomy.  The Medicare reimbursement level for an orbitotomy is greater than the reimbursement level for the CPT codes associated with the removal of granulomas.  The operation report does not refer to any transfer of tissue from the patient's mouth to her eye or eyelid, which is associated with CPT code 68325.   Defendants also improperly appended the -59 modifier to the CPT code 68325.

**Patient LC**

95.     Patient LC was treated by Goyal on several occasions from February 2014 through July 2014.  Defendants knowingly submitted, or caused to be submitted, fraudulent

---

[2] This patient appears to have developed "suture granulamas," which can form in areas of retained sutures or other embedded foreign bodies.

claims to Medicare seeking payment for services allegedly provided by Goyal to Patient LC that (i) were not actually performed; (ii) were not documented in the medical records; (iii) were not medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations. Goyal's own medical records indicate that the claims submitted to Medicare were false.

96.     Defendants billed Medicare for procedures performed on both of Patient LC's eyes on February 21, 2014. Defendants billed CPT code 67412 (orbitotomy) and CPT code 14061 (flap repair where defect area is between 10.1 and 30 square centimeters) for the procedures performed on Patient LC's left eyelid, and CPT code 67961 (excision and repair of an eyelid, involving the lid margin, tarsus, conjunctiva, canthus, or a full thickness defect of the eyelid) for the procedure performed on Patient LC's right eyelid. The medical record does not support the CPT codes billed for these procedures.

97.     With respect to the left eyelid procedure, the medical record indicates that Goyal performed a straightforward procedure involving the excision of tissue from the eyelid as opposed to the billed orbitotomy and flap repair. For example, the pathology report describes the specimen from the left eye as "portions of skin," not orbital mass or orbital tissue.

98.     With respect to the right eyelid procedure, the pathology report for the specimen is described as a "shave of skin," which is inconsistent with the full-thickness resection and repair of eyelid tissue associated with CPT code 67961. The patient's file also does not contain a signed patient consent form for the excision and reconstruction of the right eyelid, which further demonstrates that this procedure was not planned or performed. And there is no reference in the patient's file to removing sutures from the right eyelid, which would have been necessary if an excision and reconstruction of the right eyelid had been performed.

27

99.     Finally, the notes from Patient LC's treatment following the February 21, 2014 procedure refer to a ptosis repair performed on Patient LC on that date, which is not what Defendants billed to Medicare.

**Patient ND**

100.     Patient ND was treated by Goyal on several occasions from June 2016 through September 2016.  Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Medicare seeking payment for services allegedly provided by Goyal to Patient ND that (i) were not actually performed; (ii) were not documented in the medical records; (iii) were not medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations.  Goyal's own medical records indicate that the claims submitted to Medicare were false.

101.     Defendants billed Medicare for a procedure performed on Patient ND on July 7, 2016, using CPT code 67412 (orbitotomy) and CPT code 68320 (conjunctivoplasty).  The medical record does not support the CPT codes billed for this procedure and instead suggest that Goyal actually performed a less complex procedure involving the removal of a chalazion on the right upper eyelid, which has a lower Medicare reimbursement level.  For example, although the diagnosis codes submitted to Medicare indicate that Patient ND had a neoplasm of the right orbit and conjunctiva, the patient's medical record demonstrates that this was not the case.  Such lesions were not identified during Patient ND's pre-operative exam.  In addition, in his letter to the referring optometrist, Goyal stated that Patient ND had "a growth in the right upper eyelid," and did not refer to a neoplasm of the orbit or conjunctiva.  The pre-operative photographs of Patient ND also do not show any orbital or conjunctival lesion in the right eye.  Further, the pathology submission slip submitted after the surgery identified the specimen source as a lesion from the right upper eyelid, and the pathology report lists the diagnosis as a "skin tag."  Finally,

the notes from an office examination less than two weeks after the surgery describe the procedure as a removal of a lesion of the right upper eyelid, and do not mention an orbital or conjunctival surgery having been performed.  Notably, Goyal's operative report for the July 7, 2016 surgery on Patient ND is nearly identical to the report he prepared for the November 1, 2016 surgery on Patient AT (referenced above), for which Defendants also falsely billed an orbitotomy and a conjunctivoplasty.

102.    Defendants billed Medicare for a procedure performed on Patient ND's right eye on September 2, 2016, using CPT code 15823 (blepharoplasty), CPT code 67904 (ptosis repair), and CPT code 14060 (flap repair where defect is 10 square centimeters or less).  Goyal improperly appended the -59 modifier to CPT codes 15823 and 67904 to unbundle the procedures so that Medicare would reimburse the Practice for both procedures, which was prohibited by CMS at the time.  In addition, the medical record does not support the use of CPT code 14060.  Closure of a wound resulting from a blepharoplasty does not require or constitute a flap repair.  To the extent Goyal performed such a flap repair, it would have been medically unnecessary.

103.    One week following the procedure on Patient ND's right eye, Goyal performed a ptosis repair and blepharoplasty on Patient ND's left eye and again billed Medicare for CPT code 14060 without any basis for doing so.

**Patient PE**

104.    Patient PE was treated by Goyal on several occasions from September 2011 through January 2017.  Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Medicare seeking payment for services allegedly provided by Goyal to Patient PE that (i) were not actually performed; (ii) were not documented in the medical records; (iii) were not

medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations. Goyal's own medical records indicate that the claims submitted to Medicare were false.

105.     Defendants billed Medicare for a surgery to remove a skin lesion from Patient PE's face on January 26, 2012, using CPT code 21015 (removal of deep facial tissue of face), CPT code 67973 (reconstruction of lower eyelid through bridge flap from the upper eyelid to the lower eyelid where there is a full thickness defect of the lower eyelid), CPT code 15260 (full thickness graft), and CPT code 15004 (surgical preparation of an open wound or removal of scar or scab site for skin grafting or flap repair).  The medical record does not support all of the CPT codes billed for this procedure.  For example, photographs taken during the surgery and the pathology report of the specimen show a defect that is not consistent with all of these procedures having been performed.  The defect did not involve the right lower eyelid margin and did not involve the removal of deep facial tissue.  In addition, Goyal's operation report for this surgery is substantially the same as the reports he prepared for other surgeries performed on Patient PE on September 21, 2011, July 16, 2012, and August 29, 2013.

106.     Defendants billed Medicare for a procedure performed on Patient PE on July 16, 2012, using CPT code 67412 (orbitotomy) and CPT code 67961 (excision and repair of an eyelid, involving the lid margin, tarsus, conjunctiva, canthus, or a full thickness defect of the eyelid).  The medical record does not support use of the CPT codes billed for this surgery.  The operation report does not even reference an orbitotomy.  In addition, the pathology report describes the specimen submitted from the right lower eyelid as skin and mucosa, which is inconsistent with performance of the extensive eyelid procedure associated with CPT code 67961.

107.    Defendants billed Medicare for multiple procedures purportedly done on Patient PE's right upper eyelid on July 30, 2012, including the complex reconstruction of the upper eyelid.  The medical record does not support the use of CPT code 67974 (reconstruction of upper eyelid through bridge flap from the lower eyelid to the upper eyelid where there is a full thickness defect of the upper eyelid) or CPT code 15576 (creation of a flap for eyelid reconstruction), which were among the CPT codes billed to Medicare.  The pathology report describes tissue removed from the right lower eyelid, as opposed to the upper eyelid for which Defendants billed reconstruction.  In addition, a photograph of Patient PE taken on August 14, 2012, reveals no evidence of any surgery, no less major reconstructive surgery, on the patient's right upper eyelid, or evidence of the procedure associated with CPT code 15576.

108.    Defendants billed Medicare for a procedure performed on Patient PE's right eyelid on August 29, 2013, again using CPT code 67961 (excision and repair of an eyelid, involving the lid margin, tarsus, conjunctiva, canthus, or a full thickness defect of the eyelid). The medical record does not support the CPT code billed for this surgery and instead suggests that Goyal actually performed a less complex procedure involving the removal of a cyst from below Patient PE's eyelid.  For example, the preoperative photograph depicts a lesion about 0.5 cm below the right eyelid margin, as does a drawing on the document submitted to the pathology lab.  In addition, the pathology report identifies the specimen submitted as a "dermal cyst" and includes no description of eyelid margin or full-thickness eyelid tissue.

### Patient MB

109.    Patient MB was treated by Goyal on several occasions from April 2010 through February 2017.  Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Medicare seeking payment for services allegedly provided by Goyal to Patient MB that (i)

were not actually performed; (ii) were not documented in the medical records; (iii) were not medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations. Goyal's own medical records indicate that the claims submitted to Medicare were false.

110.    Defendants billed Medicare for a procedure performed on Patient MB's left eye on September 16, 2011, using, among other codes,  CPT code 68720 (dacryocystorhinostyomy) and CPT code 68750 (conjunctivodacryocystorhinostyomy).  CPT codes 68720 and 68750 are bundled procedures and may not be billed together on the same date of service.  Defendants fraudulently appended the -59 modifier to CPT code 68750 to improperly unbundle these two procedures and seek Medicare payments for both of them.

111.    Defendants billed Medicare for another surgery performed on Patient MB's left eye on November 16, 2011, using CPT code 15823 (blepharoplasty), CPT code 14061 (flap repair where defect area is between 10.1 and 30 square centimeters), CPT code 66250 (repair of an open wound of the eyeball), and CPT code 68770 (closure of lacrimal fistula).  The medical record does not support the use of CPT codes 14061 and 66250.  The operative report does not describe the procedures associated with these codes.  In addition, as discussed above, a blepharoplasty does not require a flap repair or the need to transfer or rearrange any tissue.  To the extent Goyal performed the procedure associated with CPT code 14061, it would have been medically unnecessary.

112.    Defendants billed Medicare for a surgery performed on Patient MB's left eye on September 27, 2016, using the DCR CPT code 68750 (conjunctivodacryocystorhinostyomy), CPT code 68815 (probing of tear duct with insertion of tube or stent), and CPT code 31205 (ethmoidectomy, extranasal, total).  A total ethmoidectomy involves the complete removal of tissue and bone in the ethmoid sinuses that are blocking drainage.  The medical record does not

support the use of CPT code 31205, which has a particularly high reimbursement level.  For example, the operation report lists the procedure as "Conjunctivorhinostomy with insertion of tube left eye," and does not even reference an ethmoidectomy.  While Goyal's operation report notes that the "[a]nterior ethmoidal air cells were cleaned," this does not constitute a total ethmoidectomy.  Moreover, the anesthesia record reflects a total surgical time of 12 minutes, which is far less time than it would take to perform a total ethmoidectomy, a DCR, and the probing of a tear duct with placement of a stent.  In addition, Defendants fraudulently appended the -59 modifier to CPT code 68815 to improperly unbundle this procedure from CPT code 68750 and seek Medicare payments for both procedures.

113.    Defendants billed Medicare for a procedure performed on Patient MB's left eye on November 23, 2016, using CPT code 67412 (orbitotomy) and CPT code 68320 (conjunctivoplasty), when in fact the procedure only involved the removal of a chalazion.  The medical record does not support use of the CPT codes billed for this surgery.  For example, there is no reference to an orbital mass or conjunctival neoplasm in the notes of office visits leading up to the procedure, nor are those conditions referenced in records relating to a procedure performed on the same eye less than two months earlier.  In addition, the anesthesia record reflects a total surgical time of 12 minutes, which is far less time than it would take to complete an orbitotomy and a conjunctivoplasty.  Goyal  prepared a false, boilerplate operation report to make it appear that he had performed an orbitotomy.  Indeed, this report is nearly identical to the report Goyal prepared for the November 1, 2016 surgery on Patient AT and the July 7, 2016 surgery on Patient ND (both referenced above), for which Defendants also falsely billed an orbitotomy and a conjunctivoplasty.

**Patient EC**

114.    Patient EC was treated by Goyal on several occasions from February through August 2015.  Defendants knowingly submitted, or caused to be submitted, fraudulent claims to Medicare seeking payment for services allegedly provided by Goyal to patient EC that (i) were not actually performed; (ii) were not documented in the medical records; (iii) were not medically necessary; and/or (iv) failed to otherwise comply with Medicare rules and regulations.  Goyal's own medical records indicate that the claims submitted to Medicare were false.

115.    Defendants billed Medicare for a procedure performed on Patient EC on March 11, 2010, using CPT code 66250 (repair of an open wound of the eyeball).  There is nothing in the medical record to suggest that Patient EC had an open wound of the eyeball, and there is no operative report in the patient's file describing the repair of such a wound.  Instead, it appears that Goyal performed a simple procedure involving the excision of conjunctival tissue, which is associated with a lower reimbursement level.

116.    Defendants billed Medicare for a procedure performed on Patient EC on October 7, 2010, using CPT code 68810 (probing of tear duct).  This code is associated with a procedure whereby a metal probe is passed through the length of the natural tear duct for diagnostic or therapeutic purposes, and has a relatively high Medicare reimbursement level.  The medical record does not support use of this code.  Indeed, the record shows that Patient EC's natural tear duct was no longer even present at the time of this procedure.  Defendants improperly billed Medicare for CPT code 68810 multiple times, including for services provided to Patient EC on January 13, 2011, February 10, 2011, January 18, 2012, October 9, 2014, and May 14, 2015.

117.    Defendants billed Medicare for a procedure performed on Patient EC's left eye on March 25, 2011, using DCR CPT codes 68750 (conjunctivodacryocystorhinostyomy) and

CPT code 68815 (probing of tear duct with insertion of tube or stent).  As noted above, these are bundled procedures and may not be billed together on the same date of service.  Defendants fraudulently appended the -59 modifier to the CPT code 68815 to improperly unbundle these two procedures and seek Medicare payments for both procedures.  Defendants similarly improperly appended the -59 modifier to CPT code 68815 when billing for a procedure performed on Patient EC on April 27, 2012.

118.    Defendants billed Medicare for a surgery performed on Patient EC's left eye on July 5, 2013, using CPT code 67412 (orbitotomy) and CPT code 68325 (conjunctivoplasty with buccal mucous membrane graft).  Again, the medical record does not support the CPT codes billed and instead suggests that the procedure involved the removal of scar tissue near a tube that had been previously inserted, which was not within the orbit.  Indeed, a May 13, 2013 letter from Goyal to the referring physician notes the need to remove this scar tissue and does not mention the presence of any orbital growth.  In addition, the pathology report identified the specimen submitted after the procedure as "conjunctival tissue," not an orbital mass or orbital tissue.  Furthermore, the operation report does not refer to the transfer of tissue from the patient's mouth to her eye or eyelid, which is associated with CPT code 68325.   The Practice also improperly appended the -59 modifier to the CPT code 68325.

**Patient SE**

119.    Defendants billed Medicare for an examination performed by Goyal on Patient SE on July 2, 2012, using CPT code 92226 (extended ophthalmoscopy with retinal drawing).  Goyal's own medical records indicate that the claim submitted to Medicare was false.

120.    The medical record does not support billing CPT code 92226.  There is no retinal drawing in the file.  The examination that Goyal actually performed on Patient SE was

part of a routine intermediate examination that carries a lower reimbursement rate than the extended ophthalmoscopy with retinal drawing that was billed.

## **FIRST CLAIM**

### **Violations of the False Claims Act:   Presenting False Claims for Payment (31 U.S.C. § 3729(a)(1)(A))**

121.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

122.    The Government seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(A).

123.    Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims for payment to the Government Healthcare Payors.

124.    The Government Healthcare Payors made payments to the Practice because of the false or fraudulent claims.

125.    If the Government Healthcare Payors had known that the claims presented for payment were for services not actually performed, not medically necessary, not documented in the medical records, and/or not in compliance with applicable Medicare and Medicaid rules and regulations, they would not have paid the claims.

126.    By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## SECOND CLAIM

**Violations of the False Claims Act:  Use of False Statements**
**(31 U.S.C. § 3729(a)(1)(B))**

127.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

128.    The Government seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(B).

129.    Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, and caused to be made and used, false records and statements material to the payment of false or fraudulent claims by the Government Healthcare Payors.

130.    Defendants made and/or caused to be made numerous false records and statements, including but not limited to false statements in the CMS Form 1500 or in the claims submitted electronically via the 837P process.  Defendants also falsely certified that claims complied with applicable laws, regulations, and program instructions for payment.

131.    The Government Healthcare Payors paid such false or fraudulent claims because of the acts and conduct of the Defendants.

132.    If the Government Healthcare Payors had known that the claims presented for payment were for services not actually performed, not medically necessary, not documented in the medical records, and/or not in compliance with applicable Medicare and Medicaid rules and regulations, they would not have paid the claims.

133.    By reason of these false records and statements, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

### THIRD CLAIM

**Payment by Mistake of Fact**

134.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.    The Government seeks relief against Defendants to recover monies paid under mistake of fact.

136.    The Government Healthcare Payors paid the Practice for claims based on the mistaken and erroneous belief that the claims were for services actually performed, medically necessary, properly documented, and in compliance with applicable Medicare and Medicaid rules and regulations.  These erroneous beliefs, as well as the false representations and records made by Defendants concerning the billed services and the actual performance of these services, were material to the determination to pay for the services billed.

137.    If the Government Healthcare Payors had known that the claims presented for payment were for services not actually performed, not medically necessary, not documented in the medical records, and/or not in compliance with applicable Medicare and Medicaid rules and regulations, they would not have paid the claims.

138.    By reason of the foregoing, the Government has sustained damages in a substantial amount to be determined at trial.

### FOURTH CLAIM

**Unjust Enrichment**

139.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

140.     Through the acts set forth above, Defendants have received payments to which they were not entitled and therefore were unjustly enriched.  The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Government respectfully requests judgment to be entered in its favor against Defendants as follows:

a.     On the First and Second Claims (FCA violations), for a sum equal to treble damages and civil penalties to the maximum amount allowed by law;

b.     On the Third and Fourth Claims (Payment by Mistake of Fact and Unjust Enrichment), a sum equal to the damages to extent allowed by law; and

c.     Granting the Government costs and such further relief as the Court may deem proper.

Dated:  November 22, 2019
         New York, New York


                              GEOFFREY S. BERMAN
                              United States Attorney for the
                              Southern District of New York


                    By:     /s/ Jeffrey Powell
                              JEFFREY K. POWELL
                              Assistant United States Attorney
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Telephone:  (212) 637-2706
                              Email: Jeffrey.Powell@usdoj.gov
                              *Attorney for the United States of America*